# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-0099V
UNPUBLISHED

| | |
|---|---|
| SHARON ISSERTELL,<br><br>                      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                      Respondent. | Chief Special Master Corcoran<br><br>Filed: May 17, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Shoulder Injury Related to<br>Vaccine Administration (SIRVA) |

*Paul R. Brazil*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Catherine Elizabeth Stolar*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On January 29, 2020, Sharon Issertell filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered left shoulder injuries related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine administered on November 22, 2017. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Although Respondent conceded entitlement, the parties could not agree on damages, and instead their disputed was submitted for resolution at an SPU "Motions Day" proceeding.

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$112,500.00, for actual pain and suffering.**

## I.     Relevant Procedural History

On January 29, 2020, Petitioner filed Exhibits 1-10, containing medical records and an affidavit, along with the petition (ECF No. 1). On March 23, 2020, Petitioner filed Exhibits 12 and 13, containing additional medical records (ECF No. 11). The initial status conference was held on May 14, 2020 (ECF No. 16). Petitioner filed Exhibits 14-16, containing additional medical records, on September 16, 2020 (ECF No. 19).

On June 25, 2021, a Ruling on Entitlement for Petitioner was entered, and the parties commenced damages discussions (ECF No. 28). On July 21, 2021, Petitioner filed a status report stating that the parties had reached an impasse, and requesting that a damages briefing schedule be established (ECF No. 30). Petitioner filed her damages brief on September 23, 2021 (ECF No. 33) ("Br."). Respondent filed his brief in response on January 6, 2022 (ECF No. 37) ("Resp."). On March 31, 2022, Petitioner filed a joint status report stating that the parties were amenable to, and available for, an expedited Motions Day hearing on damages on April 29, 2022 (ECF No. 41).

The Motions Day hearing occurred as scheduled, and this written decision memorializes my oral rulings issued at the conclusion of the hearing and set forth in the transcript, which was filed on May 6, 2022.

## II.    Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for

2

emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### III.     Appropriate Compensation in this SIRVA Case

#### A. Pain and Suffering

There is no dispute about Petitioner's awareness of her injury, leaving only severity and duration to be considered. In determining an appropriate award, I have reviewed the complete record in this case, as well as prior awards. My determination is based on the specific circumstances of this case.

#### 1. Relevant Factual History

On November 22, 2017, Ms. Issertell received a flu vaccine in her left deltoid during an appointment with her primary care physician, Dr. Diana Falconi. Ex. 12 at 25. The record indicates that it was "tolerated well." *Id.*

On December 7, 2017, Petitioner returned to Dr. Falconi, reporting "left shoulder pain for the last couple of weeks since she got her flu vaccine, she didn't have any type of pain at the time she had the vaccination, she started to feel the pain in the afternoon,

she had some numbness which has resolved." Ex. 12 at 21. On inspection, Petitioner's left shoulder had full, but painful, range of motion. *Id.* Her biceps tendon was mildly tender to palpation, and impingement signs were negative. *Id.* Petitioner was assessed with biceps tendinitis and advised to do stretching and strengthening exercises and use ice and ibuprofen as needed. *Id.* at 22.

Eight days later, on December 15, 2017, Petitioner presented to orthopedist Dr Michael Shea. Ex. 2 at 25. The record indicates that she was referred for evaluation of left shoulder pain caused by a vaccination. *Id.* Petitioner reported a pain level of 5 on a scale of 0-10. *Id.* However, a handwritten patient history form indicates a pain level of 8 on a scale of 0-10. Id. at 167. On examination, she was found to have positive Hawkins impingement signs. *Id.* at 26. X-rays showed mild to moderate osteoarthritis and mild spurring that was deemed typical degenerative change. *Id.* at 60-61. An ultrasound was done and revealed "a small amount of fluid and bunching of the bursa seen with dynamic testing." *Id.* at 27. Dr. Shea administered an ultrasound-guided steroid injection. *Id.* Petitioner was directed to follow up in six weeks, and the record indicates that an MRI would be considered if there was no improvement. *Id.*

Petitioner was seen by chiropractor Dr. Michael Putman on several occasions, both before and after vaccination dating back to November 29, 2010. Ex. 3 at 26. It appears that the pre-vaccination treatment was for a variety of concerns including pain in her neck, low back, left and right trapezius, and sinus. *Id.* at 27-42.

Petitioner's first chiropractic visit after vaccination occurred on December 15, 2017. Ex. 3 at 43. The record of this visit indicates that she complained of pain in the low back as well as "left side of neck, posterior cervical (neck), right side of neck and lumbar." *Id.* at 43. Objectively, Dr. Putman recorded spinal restriction or subluxation at C6, T6, and L5, which are locations on the spine. *Id.* He assessed that she was "asymptomatic and receiving maintenance care." *Id.* Her diagnosis was cervicalgia, or neck pain. *Id.* At the bottom of the page in the treatment section, there is a note about her shoulder: "Left shoulder inflammation – pecrrussor [sic] and mt;[3] left scapula adj." *Id.* Other than this single line, the record does not mention her shoulder. This sentence about left shoulder inflammation is included verbatim in the record of her December 20, 2017 visit with Dr. Putman. *Id.* at 44.

On January 5, 2018, she was again seen by Dr. Putman for a diagnosis of cervicalgia and complaining of pain in the low back, left side of neck, posterior neck, right side of neck, and lumbar. Ex. 3 at 45. This record also contains the identical note from

---

[3] It is unclear what "pecrcussor" and "mt" are intended to mean; possibly "mt" is an abbreviation for manipulative therapy, which is referenced in the same record. For purposes of this decision, I presume that they are chiropractic treatments for Petitioner's shoulder injury.

4

the previous two sessions: "Left shoulder inflammation – pecrcussor [sic] and mt; left scapula adj," and below that adds "left scapula and AI 1/5/18." *Id.*

At her next chiropractic visit, on January 19, 2018, both of the prior notes about her shoulder are again repeated, and the phrase "ultrasound to left shoulder" is added. Ex. 3 at 46. Thereafter, this combination of notes is repeated verbatim at the bottom of Petitioner's chiropractic records on February 22, 2018, July 10, 2018, August 1, 2018, August 10, 2018, August 24, 2018, October 19, 2018, November 2, 2018, November 30, 2018, January 11, 2019, and February 8, 2019.[4] Ex. 3 at 47-57.

On January 25, 2018, Petitioner was seen for acupuncture treatment with Jennifer Niemeyer. Ex. 4 at 2. Petitioner reported pain in her left shoulder resulting from a November 22 shot. *Id.* She reported that the pain began two hours after the shot, which was given high on her left shoulder in the middle of the medial deltoid. *Id.* The weekend after the shot the pain was "pretty annoying," but Petitioner reported having a high pain tolerance. *Id.* She reported that the pain was worse with movement and at night, and that the pain woke her at night. *Id.* The record includes conflicting pain levels of 7/10, 4/10, and that when sitting she did not have any pain at all. *Id.* She reported that a cortisone injection in early December "made no difference." *Id.*

She returned for another acupuncture treatment on January 29, 2018. Ex. 4 at 4. She reported that she had been pain free the night of her earlier treatment and slept through the night. *Id.* She felt good until Saturday when the pain returned. *Id.* She reported that she over exerted herself on Sunday when she went on a bike ride and pulled a twig out of the bike spokes. *Id.* She reported no pain while sitting, and a pain level of 7/10 with movement. *Id.*

On February 1, 2018, she was seen for acupuncture again. Ex. 4 at 5. She reported a pain level of 6/10, and that it had been worse, 8/10, that morning. *Id.* She reported no change from the last treatment, and that she was still waking up at least once at night. *Id.*

On February 5, 2018, she returned for another acupuncture treatment. Ex. 4 at 6. She stated that she had been feeling good, but then leaned on her left shoulder while doing yard work and felt much worse. *Id.* She reported that it was hard to sleep and she woke frequently. *Id.* She reported a pain level of 5/10. *Id.*

She returned for another acupuncture treatment on February 8, 2018. Ex. 4 at 7.

---

[4] The record contains two chart notes for October 19, 2018, one with Dr. Putman, which repeats the same language about Petitioner's left shoulder. Ex. 3 at 52. The second record for October 19, 2018 is with a different chiropractor, Dr. Heather Taylor, and does not mention Petitioner's left shoulder at all.

5

She reported a pain level of 4-5/10 the past few days. *Id.* She was still waking up at night. *Id*

Her final acupuncture visit was on February 12, 2018. Ex. 4 at 8. She reported that the last treatment had not made a difference. *Id.* She reported pain levels of 6/10 during the day, and 10/10 at night. *Id.*

On February 22, 2018, Petitioner followed up with Dr. Shea for left shoulder pain. Ex. 2 at 46. She reported that the steroid injection had provided moderate relief, but had worn off. *Id.* Dr. Shea assessed her with left rotator cuff tendinitis, and ordered an MRI. *Id.* at 46-47. Petitioner was advised to keep her elbow below shoulder height and to use heat, ice, and gentle range of motion ("ROM") to help control inflammation. *Id.*

On March 16, 2018, Petitioner underwent a physical therapy evaluation for her left shoulder. Ex. 5 at 287. She reported pain beginning two hours after a flu shot in November. *Id.* at 288. She reported that she had tried chiropractic care, acupuncture, and a cortisone injection, all without benefit. *Id.* She was in constant pain, although the intensity varied. *Id.* She reported a pain level of 8. *Id.* at 295. On examination, her active ROM was 125 degrees in flexion, with pain after 90 degrees, and 55 degrees in abduction, 25 degrees in extension, and 48 degrees in external rotation, all of which were painful.[5] *Id.* at 288. She had mildly positive impingement signs. *Id.* The physical therapist noted that her deficits included decreased ROM and function, and that her prognosis was guarded due to the length of time she had been in pain and lack of relief from other interventions. *Id.* at 288-89.

On March 23, 2018, Petitioner attended her second, and final, physical therapy session before surgery. Ex. 5 at 286. She reported increased pain, and was very frustrated. *Id.* She could not sleep and had difficulty with any ROM due to increased pain. *Id.*

On March 23, 2018, Petitioner underwent a left shoulder MRI. Ex. 2 at 58. The MRI revealed extensive diffuse supraspinatus tendinosis with high grad partial thickness delaminating tears. *Id.* at 59. The MRI also showed infraspinatus tendinosis with partial thickness-tears, a moderate amount of shoulder joint effusion, a moderate amount of fluid in the subdeltoid subacromial bursa with debris from extensive bursitis and synovitis, diffuse ill-defined fluid in the rotator interval from synovitis, and a suspected SLAP tear. *Id.*

---

[5] Normal shoulder for adults ranges from approximately 165 to 180 in flexion, 170 to 180 degrees in abduction, 50 to 60 degrees in extension, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 76, 80, 88 (F. A. Davis Co., 5th ed. 2016).

On March 29, 2018, Petitioner was seen by Dr. Shea to review her left shoulder MRI. Ex. 2 at 42. Dr. Shea assessed Petitioner with rotator cuff tendinitis, and referred her for surgical evaluation. *Id.* at 44-45.

On April 11, 2018, Petitioner was seen for a rheumatology consultation by Dr. Thitinan Srikulmontree. Ex. 2 at 11-17. The record indicates that she was referred by Dr. Shea due to a mildly positive lab result discovered during a shoulder workup. *Id.* at 11. Petitioner reported shoulder/arm pain beginning two hours after her flu shot on November 22, 2017. *Id.* at 163. On examination, Dr. Srikulmontree found no active synovitis or RA[6] deformity. *Id.* at 11. Petitioner's range of motion was intact, with positive left shoulder impingement signs. *Id.* Because there were no clinical findings of RA, Dr. Srikulmontree determined that orthopedic evaluation was appropriate. *Id.*

On May 2, 2018, Petitioner was seen by Dr. Robert Lucas for left shoulder pain. Ex. 2 at 5. She reported that her symptoms had begun approximately five and a half months earlier after a flu shot in her left upper arm. *Id.* She had tried conservative treatment with a cortisone injection, chiropractic care, acupuncture, and physical therapy without improvement. *Id.* She reported significant pain with reaching or lifting, and at night while sleeping. *Id.* On examination, her ROM was 150 degrees in elevation, 80 degrees in abduction, 30 degrees in external rotation, and she had positive impingement signs. *Id.* at 8. Dr. Lucas reviewed her MRI, which showed a near full-thickness tear of her supraspinatus tendon and significant fluid in the subacromial space. *Id.* at 5, 10. Because her symptoms had been unresponsive to multiple conservative treatments, Dr. Lucas recommended surgical rotator cuff repair. *Id.* at 10.

On June 5, 2018, Petitioner underwent left shoulder surgery. Ex. 7 at 3. She reported a pre-op pain level of 3. *Id.* at 7. Dr. Lucas performed arthroscopic rotator cuff repair, subacromial decompression, and extensive debridement. *Id.* at 3. He found diffuse erythema in the synovium within the joint, with degenerative-appearing labral fraying. *Id.* There was erythema tracking along the biceps tendon, and partial thickness tear fraying of the subscapularis tendon, with the majority of the subscapularis intact and stable. *Id.* He found high-grade partial thickness tearing of the supraspinatus tendon. *Id.* The infraspinatus tendon was intact with some articular sided fraying, and the teres minor was intact. *Id.* He lysed remaining subacromial adhesions. *Id.*

On June 20, 2018, Petitioner had her first post-operative consult with Dr. Lucas. Ex. 2 at 37. She reported that she was doing well with minimal pain. *Id.* She was off narcotics and taking ibuprofen as needed. *Id.* She was wearing a sling at all times, but

---

[6] Based on the context and Dr. Srikulmontree's specialty, RA likely stands for rheumatoid arthritis.

7

had been in her garden pulling weeds the second day after surgery, and her husband thought she was doing too much. *Id.* She was scheduled to start physical therapy on June 26. *Id.* On examination her surgical incisions were well-healed with no evidence of infection. *Id.* at 38. She had no pain or crepitus with passive ROM through a limited arc. *Id.* Dr. Lucas saw no signs of complication, and recommended that she continue to immobilize her shoulder using the sling and limit activity to allow the repaired tendon to heal. *Id.*

On June 26, 2018, Petitioner underwent a physical therapy evaluation for her shoulder. Ex. 5 at 60. She was still in her sling and complained of pain and decreased ROM and function. *Id.* She reported that she had not taken pain medication since the second day after surgery. *Id.* She continued to experience difficulty sleeping, and her pain was aggravated by movement and sleeping. *Id.* She reported a pain intensity of 3/10. *Id.* at 74. On examination, her left shoulder ROM was 90 degrees in flexion, 80 degrees in abduction, and 5 degrees in extension and external rotation. *Id.* at 60.

On July 18, 2018, Petitioner was seen by Dr. Lucas for a post operative appointment. Ex. 2 at 35. She was taking 800 mg of ibuprofen one or two times daily and doing well, with minimal pain. *Id.* She reported sleeping okay and gradually improving. *Id.* Dr. Lucas noted that she was "appropriately stiff on examination," and recommended that she discontinue the sling and continue physical therapy focusing on passive ROM followed by advancing to active assisted ROM. *Id.* at 36.

Petitioner attended a total of twelve physical therapy sessions between June 26 and September 27, 2018. Ex. 5 at 58. Her ROM gradually improved, and by August 16, 2018 she was able to do her exercises without pain. *Id.* at 50-57. At her session on August 30, 2018, she was able to tolerate increased weights during her session. *Id.* at 49.

On August 29, 2018, Petitioner was seen by Dr. Lucas for a three month post operative evaluation. Ex. 2 at 31. She reported that she was doing well, with minimal pain. *Id.* She was taking ibuprofen every few days for occasional soreness, but no regular pain medication. *Id.* Physical therapy was going well and she had advanced to light strengthening. *Id.* She was sleeping okay without problems. *Id.* She reported that she was gradually improving in regard to both range of motion and function. *Id.* Dr. Lucas recommended that she continue physical therapy. *Id.* at 33. He advised that she continue to avoid activities such as lifting heavy objects away from her body or sudden sharp motion such as starting a lawnmower. *Id.*

At Petitioner's second to last session on September 20, 2018, she reported shoulder pain, and stated that she was fatigued after the session. Ex. 5 at 45-47. At her final physical therapy session on September 27, 2018, Petitioner had near normal passive

ROM and "good+" active ROM. *Id.* at 58. She was able to do all activities of daily living, and went to the gym to work on her shoulder on a regular basis. *Id.* She was instructed to continue her shoulder work at the gym. *Id.*

Petitioner was seen by her primary care provider, Dr. Falconi, on September 27, 2018 to follow up on chronic conditions. Ex. 2 at 86. The ongoing problem list includes "Rotator cuff tear," and the historical problem list and past medical history list "Biceps tendonitis," "Rotator cuff tendinitis, left" and "Shoulder pain." *Id.* at 86-87. The record contains no other mention of her shoulder condition. *Id.*

### 2. Parties' Arguments

Ms. Issertell requests a pain and suffering award of $125,000.00. Br. at 1. In support, she cites a number of prior SIRVA decisions, including *Berge*, *Reynolds*, and *Smith*, in which the pain and suffering awards were $115,000.00, $125,000.00, and $125,000.00, respectively.[7]

Petitioner asserts that this case and *Berge* involve the same duration of treatment, ten months, and petitioners in both cases were unable to tolerate pre-surgical physical therapy due to pain. Br. at 5. Both petitioners underwent surgery, although the petitioner in *Berge* had significant comorbidities not present in this case. *Id.* This case is also similar to *Reynolds,* because both petitioners first presented for treatment fifteen days after vaccination, and reported similar pain levels of 3-6/10 prior to surgery. *Id.* at 5-6. Petitioner adds that the petitioner in *Reynolds* also underwent surgery, and participated in twelve physical therapy sessions. *Id.* at 6. Petitioner asserts that this case is similar to *Smith* in that both petitioners promptly sought treatment for shoulder pain, and had similar pain ratings. *Id.*

Petitioner argues that she sought treatment immediately post-vaccination, demonstrating the urgency of her symptoms. Br. at 6. She asserts that her MRI revealed a severe injury including tears, moderate fluid collection in the joint, extensive diffuse tendinitis, and moderate fluid and debris in the bursa from extensive bursitis and synovitis. *Id.* She exhausted conservative treatment options, underwent surgery, and attended twelve therapy sessions after surgery. *Id.*

Petitioner's brief includes a table comparing her treatment to *Berge*, *Reynolds*, and *Smith*. Br. at 7. She had 32 therapeutic visits, including 14 physical therapy, 12

---

[7] *Berge v. Sec'y of Health & Human Servs.*, No. 19-1474V, 2021 WL 4144999 (Fed. Cl. Spec. Mstr. Aug. 17, 2021); *Reynolds v. Sec'y of Health & Human Servs.*, No. 19-1108V, 2021 WL 3913938 (Fed. Cl. Spec. Mstr. July 29, 2021); *Smith v. Sec'y of Health & Human Servs.*, No. 19-0745V, 2021 WL 2652688 (Fed. Cl. Spec. Mstr. May 28, 2021).

chiropractic, and six acupuncture. *Id.* Petitioner asserts that the chiropractic care was "focused on shoulder treatment." *Id.* at 2. At the damages hearing, Petitioner reiterated her argument that "shoulder treatment was rendered on each visit" to the chiropractor. Tr. at 3.

At the damages hearing, Petitioner argued that there were 195 days between her vaccination and surgery, and during that time "[s]he had no respite from pain." Tr. at 5. She adds that she was unable to continue physical therapy prior to surgery due to pain. *Id.* She disputed Respondent's characterization of the cases she relies on, arguing that the pain ratings in those cases were not more severe but were actually similar to her own. *Id.*

Petitioner also argued that objective evidence such as her MRI show that her injury was likely *more* severe than those in *Berge*, *Reynolds*, and *Smith*. Tr. at 6. Petitioner notes that Responded did not cite any cases to support his proposed award, and suggests this is because there are no cases that would support that figure. *Id.*

Respondent argues that the severity and duration of Petitioner's SIRVA do not warrant the requested $125,000.00 award, and instead proposed $82,500,00 for pain and suffering. Resp. at 8. Respondent acknowledges that Petitioner experienced moderate pain at onset, and that conservative therapy provided ineffective. *Id.* However, Respondent asserts that Petitioner quickly improved following surgery, achieving a near complete recovery after twelve post-operative PT sessions. *Id.* Respondent also emphasizes Petitioner's uncomplicated post-operative course, reporting only minimal pain three weeks after surgery. *Id.* Respondent agrees that the injury duration was ten months, but emphasizes the lack of continuing limitations or pain. *Id.*

Respondent thus asserts that Petitioner's injury was both less severe and more responsive to treatment than the injuries in the cases Petitioner relies on. Resp. at 8. Respondent asserts that the petitioner in *Berge* experienced more severe pain. *Id.* at 8-9. Respondent argues that the petitioner in *Reynolds* continued to experience discomfort six months after his shoulder surgery, and continued treating with Tylenol and Mobic for pain relief six weeks after surgery. *Id.* at 9. Respondent adds that the petitioner in *Reynolds* demonstrated limitations six months after surgery that the court indicated were likely permanent. *Id.* In contrast, Respondent also notes that at the time of Petitioner's discharge from PT, she had essentially no left shoulder disability and was able to perform all activities of daily living. *Id.*

Respondent argues that in *Smith*, the duration of the petitioner's injury was approximately 13 months, and the petitioner attended 35 post-surgery physical therapy sessions. Resp. at 10. In contrast, the petitioner in this case treated for less than ten

10

months and attended 12 post-surgery physical therapy sessions. *Id.*

With respect to Petitioner's chiropractic treatment, Respondent disagrees with Petitioner's characterization of this care as being focused on shoulder treatment. Resp. at 3 n.2. Respondent notes that the subjective section of the records do not contain any complaints of shoulder pain. *Id.* Respondent states that Petitioner appears to have sought chiropractic care primarily for other ailments, such as pain in her low back and right hip. *Id.*

At the Motions Day hearing, Respondent argued that the chiropractic records do not support Petitioner's claim that all 12 visits were for her left shoulder. Tr. at 7. Instead, the records indicate that she presented for these visits complaining of low back pain, and that the treatment mentioned for her left shoulder is repeated at every visit. *Id.* Respondent suggests that it is more likely that Petitioner complained of left shoulder pain at the first visit in December 2017,[8] and then the same language was copied and pasted repeatedly in the electronic records. *Id.* Respondent adds that the diagnosis in each record is cervicalgia, which is not related to her left shoulder symptoms. *Id.*

Respondent also emphasizes the MRI and surgery findings, which discuss degenerative findings. Tr. at 7-8. Respondent notes that Petitioner was 61 years old at the time of vaccination, and asserts that the degenerative findings are significant in that context, suggestive of an age-related disorder rather than something caused by the vaccine. *Id.* at 8. Thus, Respondent asserts that it would be an overstatement to conclude, based on the MRI findings, that Petitioner's injury in this case is more severe than the other cases cited. *Id.*

Similarly, Respondent asserts that the surgical report also discusses finding degenerative appearing tissue. Tr. at 8. Respondent asserts that this confirms the MRI findings and is consistent with Petitioner's age. *Id.* Thus, Respondent suggests that it is not clear that all of Petitioner's findings were due to the vaccine injury. *Id.*

Respondent disputes Petitioner's assertion that she had no respite from the pain. Tr. at 9. Rather, after the first acupuncture treatment, Petitioner stated that she felt good until Saturday, and then the pain came back, also mentioning that she overexerted herself on a bike ride by pulling a twig out of the spokes. *Id.* Respondent adds that at Petitioner's fourth acupuncture visit, Petitioner also reported feeling good until she did some yard work and leaned her body weight on her left shoulder. *Id.* Respondent asserts that if Petitioner felt as bad as she claims, she would not have engaged in yard work. *Id.*

---

[8] As stated above, Petitioner had been seen by the chiropractor for several years prior to the vaccine at issue in this case. Based on the context, it appears that Respondent here refers to the first chiropractic visit after vaccination, on December 15, 2017.

11

Respondent did not provide comparables specifically defending his favored pain and suffering award, but disclaimed the need to do so. It is a petitioner's burden to prove damages, Respondent noted, and it was therefore reasonable for Respondent merely to point out deficiencies in the Petitioner's arguments. Tr. at 11. Respondent also expressed the view that many recent SPU pain and suffering determinations have exceeded what Respondent considers reasonable. Tr. at 12. An award in excess of $100,000 for this type of an injury is not reasonable, in Respondent's view. *Id.* at 13.

### 3. Analysis

Based on the record and parties' arguments, I conclude that the pain and suffering award should not be as high as Petitioner proposes, nor as low as Respondent suggests.

There is objective, medical record evidence supporting a finding that Petitioner's symptoms continued for ten months. She had a moderate injury, which did not respond to conservative treatment. She underwent surgery, and had a good result after surgery.

I acknowledge that prior to surgery, Petitioner did experience short periods of relief from treatment. However, the record demonstrates that the relief she received was short lived, and that her pain returned from engaging in activities that would not ordinarily cause pain to a person without her injury such as removing a twig from a bicycle spoke and leaning on her shoulder. Thus, I find that the record demonstrates that she did not receive meaningful pain relief until *after* surgery.

Respondent contends that Petitioner had pre-existing degenerative conditions and thus not all of her symptoms can be attributed to her vaccine injury. However, it is significant that, whatever pre-existing degenerative damage Petitioner may have had, she was asymptomatic prior to vaccination. Respondent's argument that damages should be discounted on the basis of some degenerative findings in the MRI and surgical reports is not convincing.

The parties dispute the extent to which Petitioner's chiropractor appointments were for her shoulder injury. The record reflects that her chiropractic treatments began well before her shoulder injury, and were primarily for other concerns. Based on the records, it is more likely than not that Dr. Putman provided some minimal treatment for Petitioner's shoulder pain at least during the four visits between December 15, 2017 and January 19, 2018. These records show some non-duplicative notations about her shoulder, suggesting that her shoulder was discussed and treated. Thereafter, however, the remaining records repeat the same language verbatim for over a year, suggesting that more likely than not, the language was simply copied from one record to the next, and

that little or no shoulder treatment was provided at these visits.

I acknowledge Respondent's belief that SIRVA damage awards are higher than he believes reasonable.[9] However, it does not seem that statistics involving *all* damages awarded in SPU cases support Respondent's argument. As of January 1, 2022, damages had been awarded in 2,306 SIRVA cases in the SPU, with more than half (1,311) resolved by proffer or a damages decision by a special master.[10] The table below summarizes data for damages awarded in decisions by special masters and in proffered cases, as of January 1, 2022:

|  | **Damages Decisions by Special Master** | **Proffered Damages** |
|---|---|---|
| **Total Cases** | 88 | 1,223 |
| **Lowest** | $40,757.91 | $25,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 |
| **Median** | **$95,974.09** | **$90,000.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 |
| **Largest** | $265,034.87 | $1,845,047.00 |

As the table above demonstrates, the median of proffered damages from Respondent – which includes *all* SIRVA cases, surgical and non-surgical – is $90,000. The median award in reasoned damages decisions from a special master is higher than that in proffered damages cases, but the difference is not as great as Respondent implies. Thus, it does not appear that Respondent's sense about inflated damages awards is reflected in the actual outcomes rendered in the Program.[11]

This leaves the question of what is a reasonable award given Petitioner's specific circumstances. Of the cases cited in Petitioner's brief, I find *Berge* to be the most useful. That petitioner was awarded $115,000 for pain and suffering for an injury of comparable duration (ten months) and severity. The *Berge* petitioner may, however, have had a slightly more severe injury initially, as evidenced by his inability to undergo a complete physical therapy evaluation prior to surgery. *Berge*, 2021 WL 4144999, at *5. But that

---

[9] Petitioner, in reaction, argued that Respondent's proposed award in this case is in line with what Respondent would have proffered a few years ago in a less severe case not involving surgery, and that it appears that Respondent is now trying to reduce awards by proposing lower, indefensible figures. Tr. at 14-15. Petitioner asserts that this puts petitioners (and the Vaccine Program) in "an impossible situation." *Id.* at 15.

[10] The remaining cases were resolved by stipulated damages or a stipulated agreement.

[11] To the extent Respondent disputes the reasonableness of a particular SIRVA pain and suffering award, he has the remedy of a motion for review.

petitioner did not require therapy following surgery, suggesting an easier recovery. *Id.* at *6.

I also find *Wilt*,[12] although not cited by the parties, to be a useful benchmark. The *Wilt* petitioner also underwent surgery and two rounds of physical therapy. *Wilt*, 2020 WL 1490757, at *14. The injury duration in *Wilt* was similar, with similar but slightly higher pain ratings, and that petitioner attended slightly more physical therapy (four sessions before surgery and 16 after). The petitioner in *Wilt* was awarded $110,000.00 for pain and suffering.

I find the best range in this case is between *Wilt* and *Berge*. Thus, taking all of the above into account, I award Petitioner $**112,500.00** for pain and suffering.

## IV. Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $112,500.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[13]

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $112,500.00 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

                                                     **s/Brian H. Corcoran**
                                                     Brian H. Corcoran
                                                     Chief Special Master

---

[12] *Wilt v. Sec'y of Health & Human Servs.*, No. 18-0446V, 2020 WL 1490757 (Fed. Cl. Spec. Mstr. Feb. 24, 2020).

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.